IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs March 12, 2002

## STATE OF TENNESSEE v. ROBERT S. CLARK

**Appeal from the Criminal Court for Shelby County
Nos. 99-06263, 99-06264      W. Otis Higgs, Jr., Judge**

─────────────

**No. W2001-00921-CCA-R3-CD  - Filed August 5, 2002**

─────────────

The defendant, Robert S. Clark, was convicted of two counts of robbery.  The trial court imposed concurrent four-year sentences.  In this appeal of right, the defendant asserts that there was prosecutorial misconduct during voir dire and that the trial court erred by excluding certain expert testimony.  Because there is no reversible error, the judgments of the trial court are affirmed.

**Tenn. R. App. P. 3; Judgments of the Trial Court Affirmed**

GARY R. WADE, P.J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ALAN E. GLENN, JJ., joined.

Jefferson D. Gilder, Southaven, Mississippi (on appeal), and Leslie Ballin and Gray Bartlett, Memphis, Tennessee (at trial), for the appellant, Robert S. Clark.

Paul G. Summers, Attorney General & Reporter; P. Robin Dixon, Jr., Assistant Attorney General; and Greg Gilluly and Betsy Carnesale, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

On November 20, 1998, a robber carrying a police scanner entered a Union Planters Bank branch located in the Jitney Premier grocery store in Cordova, Tennessee.  At the teller counter, he announced that he had a gun in his pocket and demanded that a bag he was carrying be filled with money.  The tellers complied.  The police were alerted by a silent alarm just as the robber left.  After a photograph of the robber made from the bank's security videotape appeared in the local newspaper, police received an anonymous tip identifying the defendant as the robber.  Later, bank tellers Saleem Samana and Joshua Marino identified the defendant from a photographic lineup.

# I

Initially, the defendant contends that the trial court erred by excluding the proffered expert testimony of William Bearden, who had analyzed and digitized the security videotape of the robbery. The state argues that because Bearden was not qualified as an expert and because his testimony would not have substantially assisted the jury, the trial court properly excluded the evidence.

Generally, the admission of expert testimony is largely entrusted to the sound discretion of the trial court. State v. Ballard, 855 S.W.2d 557, 562 (Tenn. 1993). The trial court's decision may be overturned on appeal only upon a showing that the trial court abused its discretion. Id. "[A]n appellate court should find an abuse of discretion when it appears that a trial court applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining." State v. Shuck, 953 S.W.2d 662, 669 (Tenn. 1997).

After the state rested its proof in chief, the defense called William Bearden as an expert on film and videotape. When, however, an objection was lodged by the state, the trial court disallowed the testimony, holding that the defense had an obligation to notify the state of its intention to present the witness and that the proposed testimony would not be of assistance to the jury:

> Now, as I understand it in this case there's a serious question about the quality of the video. There's a serious question as to whether . . . the person in the video is, indeed, the defendant. . . . [W]e have admitted that video tape into evidence. . . . [T]he weight and credibility of the evidence in the record [are] something for the jury to determine.
> Both of you will be allowed to argue that the person in the video is or is not the defendant. The jury will make that final determination, and the video speaks for itself. I'm not going to allow an expert witness now, today, in the middle of the trial to come forward . . . . And I'm not sure it's relevant to bring this kind of person in relative to the quality of the videotape.
> I mean, the jury itself can determine from what we have in evidence that there's no clear, distinctive features on the person in the video. They'll have to make a determination as to whether or not it's really the defendant . . . .

Afterwards, in a hearing out of the presence of the jury, Bearden testified that he obtained a degree in education from the University of Memphis and that after graduating, he was employed by a film laboratory where he was a film editor and timer. He stated that he began his own video production company in 1988 and had "edited literally . . . thousands of hours of finished programs." According to Bearden, he had digitized the security videotape of the robbery onto the hard drive of his edit system and then printed individual frames that he edited with Adobe Photo Shop software: "I would take it in and clean it up as I could, de-interlace the video image, sharpen it a little bit, maybe make it monochrome . . . and just try to make it the best it could be . . . ." Bearden acknowledged that he had never before testified as an expert witness.

The admissibility of expert testimony is governed by Rules 702 and 703 of the Tennessee Rules of Evidence. McDaniel v. CSX Transp., Inc., 955 S.W.2d 257 (Tenn. 1997). Rule 702 addresses the need for expert testimony and the qualifications of the expert:

> If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise.

Tenn. R. Evid. 702. Its counterpart, Rule 703, focuses on the reliability of expert opinion testimony:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence. The court shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness.

Tenn. R. Evid. 703.

In McDaniel v. CSX Transportation, Inc., our supreme court concluded that to determine "the standard of admissibility of scientific evidence requires an analysis of the unique language found in Rules 702 and 703 of the Tennessee Rules of Evidence." 955 S.W.2d at 264. Our high court observed that Rule 702 requires that the evidence "substantially assist the trier of fact," while the federal rule requires only that the evidence "assist the trier of fact." Id. The court concluded that the probative force of expert testimony must be stronger in this state's courts than under the federal rules. Id. Rule 703 provides that trial courts "'shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate a lack of trustworthiness.'" Id. (quoting Tenn. R. Evid. 703). Even if expert testimony tends to provide substantial assistance to the jury, the testimony is admissible only if it is based upon reliable facts or data. State v. Shuck, 953 S.W.2d 662, 668 (Tenn. 1997).

Recently, in State v. Stevens, ___ S.W.3d ___, No. M1999-02067-SC-DDT-DD (Tenn. 2002), our supreme court approved the application of McDaniel to nonscientific expert testimony. The court observed that "nonscientific testimony must still meet the stringent requirements of relevance and reliability. . . . [N]othing in the language of Rules 702 and 703 suggests that scientific testimony should be treated any differently than expert opinions based on technical or nonscientific specialized knowledge." Id., slip op. at 12-13. In determining whether to admit the testimony of a proffered nonscientific expert, trial courts may consider the following:

> (1) the McDaniel factors, when they are reasonable measures of the reliability of expert testimony; (2) the expert's qualifications for testifying on the subject at issue; and (3) the straightforward connection between the expert's knowledge and the basis

-3-

for the opinion such that no "analytical gap" exists between the data and the opinion offered.

Id. at 15.

Initially, the defense did not identify Bearden, disclose its intent to call him as a witness, or provide the state with copies of his security video stills until mid-way through the trial. The state, of course, would have been entitled to Bearden's stills had it made an appropriate request after initiation of discovery by the defendant. See Tenn. R. Crim. P. 16(b)(1)(B). The record, however, does not contain any motions or orders pertaining to discovery and this court cannot, therefore, discern what discovery information the defense may have been obliged to provide or when it should have been made available. Furthermore, the defendant asserts that he could not have identified Bearden earlier because the state did not timely provide an acceptable copy of the security video for him to digitize and edit. The record reflects that the state produced two copies of the video to the defense sometime prior to trial, but that both copies were defective. The state did not produce an acceptable copy until jury selection began. Any delay in disclosure of the witness, under these circumstances, cannot be blamed on the defense.

Additionally, Bearden appears to be qualified as an expert in the field of video production. He testified, among other things, that he owns his own video production company and that he has edited thousands of hours of videotape. While he has no formal education in the field, he demonstrated substantial knowledge, skill, and experience. See Tenn. R. Evid. 702. It is irrelevant that Bearden was not present during the robbery. The state argued at trial that Bearden's video stills were inadmissible because Bearden could not "authenticate [them] because he can't say whether that photograph fairly and accurately depicts the robber, because he wasn't there." The videotape from which Bearden extracted the stills had already been properly authenticated and entered into evidence. His testimony would have needed only to explain his alterations and their underlying processes in order to support a finding by the trier of fact that the stills were what he claimed them to be. See Tenn. R. Evid. 901(a) ("The requirement of authentication . . . is satisfied by evidence sufficient to the court to support a finding by the trier of fact that the matter in question is what its proponent claims."). In our view, the trial court should not have summarily excluded Bearden's testimony. The state did not claim prejudice by the delay in identifying Bearden as a witness. Exclusion of the expert was the harshest remedy available to the trial court. A more appropriate measure would have been to offer the state a continuance so as to allow time for preparation and response.

Although there was error, it is our view that the proffered testimony would not have been of substantial assistance to the jury. During its case in chief, the state introduced the original videotape and 18 still frames. While the still frames are not high quality, they are relatively clear and provide some detail. By comparison, the edited still frames produced by Bearden are actually blurrier and provide fewer details. There is no indication that the jury would have benefitted, substantially or otherwise, by the introduction of Bearden's testimony or his still frames. See Tenn. R. Evid. 702; see also Tenn. R. App. P. 36(b) ("A final judgment . . . shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment . . .

.”). Additionally, it was Bearden's opinion that the individual depicted in the video and stills was not the defendant. After examining the record, this court has been unable to find any logical basis for the opinion. See Tenn. R. Evid. 703. In sum, while Bearden's testimony and the edited still frames should have been admitted, their quality would not have made a difference in the result.

## II

Next, the defendant asserts that the trial court erred by admitting the security videotape of the robbery. He contends that a proper chain of custody was not established and that no witness authenticated the tape.

As a condition precedent to the introduction of tangible evidence, a witness must be able to identify the evidence or establish an unbroken chain of custody. State v. Goodman, 643 S.W.2d 375, 381 (Tenn. Crim. App. 1982). The purpose of the chain of custody requirement is to "demonstrate that there has been no tampering, loss, substitution, or mistake with respect to the evidence." State v. Braden, 867 S.W.2d 750, 759 (Tenn. Crim. App. 1993). While the state is not required to establish facts which exclude every possibility of tampering, the circumstances established must reasonably assure the identity of the evidence and its integrity. State v. Ferguson, 741 S.W.2d 125, 127 (Tenn. Crim. App. 1987). This rule does not require absolute certainty of identification. Ritter v. State, 3 Tenn. Crim. App. 372, 462 S.W.2d 247, 250 (Tenn. Crim. App. 1970). Absent sufficient proof of the chain of custody, however, the "evidence should not be admitted . . . unless both identity and integrity can be demonstrated by other appropriate means." Neil P. Cohen et al., Tennessee Law of Evidence § 9.01[13][c] (4th ed. 2000). A leading Tennessee treatise provides as follows:

> The concept of a "chain" of custody recognizes that real evidence may be handled by more than one person between the time it is obtained and the time it is either introduced into evidence or subjected to scientific analysis. Obviously, any of these persons might have the opportunity to tamper with, confuse, misplace, damage, substitute, lose and replace, or otherwise alter the evidence or to observe another doing so. Each person who has custody or control of the evidence during this time is a "link" in the chain of custody. Generally, testimony from each link is needed to verify the authenticity of the evidence and to show that it is what it purports to be. Each link in the chain testifies about when, where, and how possession or control of the evidence was obtained; its condition upon receipt; where the item was kept; how it was safeguarded, if at all; any changes in its condition during possession; and when, where and how it left the witness's possession.

Id. The issue addresses itself to the sound discretion of the trial court; its determination will not be disturbed in the absence of a clearly mistaken exercise of such discretion. State v. Beech, 744 S.W.2d 585, 587 (Tenn. Crim. App. 1987); State v. Johnson, 673 S.W.2d 877, 881 (Tenn. Crim. App. 1984). Reasonable assurance, rather than absolute assurance, is the prerequisite for admission.

Here, the trial court did not abuse its discretion by admitting the security videotape of the robbery. Deputy Joe Everson of the Shelby County Sheriff's Department testified that the tape was recovered from the Union Planters "security man," Blake Gerald. The deputy stated that he then used sheriff's department equipment to make copies of the video and print a variety of still shots of the robber. According to Deputy Everson, the videotape then remained secured in the evidence room until he checked it out for trial. Because Blake Gerald did not testify, the chain of custody for the videotape is not technically complete. Additionally, there was some confusion in Deputy Everson's testimony in that at one point he affirmed that "[t]his is the video tape that I picked up from the FBI Evidence Room and delivered into this Memphis Police Department Evidence Room." Any failure in the chain of custody was, however, remedied by the testimony of Saleem Samana and Joshua Marino, the teller-victims, who confirmed that the videotape fairly and accurately depicted the robbery. See Tenn. R. Evid. 901(b)(1); State v. Williams, 913 S.W.2d 462, 465 (Tenn. 1996) (holding that robbery victim properly authenticated still photographs printed from security camera videotapes).

III

Next, the defendant complains of prosecutorial misconduct during voir dire. Specifically, he argues that the prosecutor attempted to erode the defendant's presumption of innocence.

In Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976), this court established five factors to be considered in determining whether alleged instances of prosecutorial misconduct might have affected the verdict to the prejudice of the defendant:

(1) the conduct complained of viewed in context and in light of the facts and circumstances of the case;
(2) the curative measures undertaken by the court and the prosecution;
(3) the intent of the prosecutor in making the improper statement;
(4) the cumulative effect of the improper conduct and any other errors in the record; and
(5) the relative strength or weakness of the case.

The defendant's complaints relate to two separate comments by the state. First, the assistant district attorney general gave the prospective jurors the following "civics lesson:"

And once the crime is committed – I'm just going to give you a little civics lesson before we get started, before I begin asking general questions. When the crime is committed someone is generally arrested, and after that they have a right to present their case to what's called the Grand Jury. Does anyone know what a Grand Jury is?

*       *       *

It's basically a group of citizens like yourself who are called together from all around our community, and they listen to the [s]tate. We present some evidence and

-6-

they determine whether there's probable cause that a crime's committed, and whether or not the defendant is the one who committed the crime.

At that point, defense counsel objected and requested a new jury panel. The trial judge sustained the objection. Instead of granting a new panel, he gave the following curative instruction:

> Alright, ladies and gentlemen, you can disregard the [p]rosecutor's statement about the civics lesson. And remember during this process the lawyers are going to ask you some questions, and what they say is not necessarily the law of the facts.
> They simply ask questions based on their concept of what this case is all about. You take the law properly from this [c]ourt. So just disregard that statement about a civics lesson.

Subsequently, the prosecutor asked the following question of the prospective jurors:

> Does anyone think that just because the defendant pled not guilty he's obviously not guilty?
> He has that constitutional right to have a jury trial, would you agree with me there?

Again, defense counsel objected and the trial court sustained the objection and instructed the potential jurors as follows:

> Ladies and gentlemen, please disregard the past question that you were asked by the prosecutor. Disregard the question in its entirety.

In our view, the prosecutor's comments during voir dire do not warrant reversal. The statements were general in nature and any prejudice resulting therefrom would have been minimal. The trial court instructed the jury to disregard the statements and to accept instructions on the law only from the court. Moreover, there is no indication that the prosecutor was acting with the intent to provoke unfair bias among the potential jurors or to otherwise impede the defense.

IV

Finally, the defendant raises a series of evidentiary issues. He initially complains that the trial court erroneously permitted Deputy Joe Everson to testify that investigators had found fingerprints at the scene but were unable to make any identification from the prints. He asserts that the deputy had not been trained in fingerprints and did not have any firsthand knowledge of the identification process. The deputy, who was present at the crime scene, testified that he observed crime scene officers lift several fingerprints. Over a defense objection, he was also permitted to testify that police "were not able to identify anyone based on prints."

Generally, hearsay evidence is inadmissible. Tenn. R. Evid. 802. Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). In our view, the trial court properly permitted Deputy Everson to testify that fingerprint evidence was recovered at the scene. The deputy was present when the crime scene was investigated and personally observed the fingerprints being lifted. His testimony that the fingerprints failed to identify a suspect qualified as inadmissible hearsay, however, and should have been excluded. Deputy Everson had not been trained in fingerprinting, suggesting that his information regarding the results of any analysis came from someone else. Nevertheless, the fingerprint evidence was of no assistance to police and did not implicate the defendant. Accordingly, the error was harmless. See Tenn. R. App. P. 36(b) ("A final judgment . . . shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment . . . ."); State v. Edwards, 868 S.W.2d 682 (Tenn. Crim. App. 1993).

Similarly, the defendant asserts that the trial court erred by permitting Deputy Everson to testify that a third teller, who was present during the robbery but who did not testify at trial, could not identify anyone as the robber. Defense counsel elicited the contested testimony during cross-examination of the deputy:

> Q    You didn't talk to her, take a statement from her?
> A    Someone took a statement from - one of the other officers that responded to the scene. Personally I did not take a statement from her.
>                         *      *      *
> Q    Did any other officer show this female bank employee a similar photospread?
> A    It is very well possible that she might have seen one, but she would not [be] use[d] for identification purposes because during her statement she stated she wouldn't be able to identify anybody.

At that point, defense counsel requested a bench conference and objected on the grounds that Deputy Everson's answer was non-responsive. The trial court instructed defense counsel to ask the question a second time and, in response, the deputy responded that he did not know whether any other officers had showed the third teller a photospread.

Initially, defense counsel did not object on hearsay grounds. A defendant may not object on one ground in the trial court and then assert a new or different theory on appeal. See State v. Adkisson, 899 S.W.2d 626, 634-35 (Tenn. Crim. App. 1994). While Deputy Everson's comment that the teller could not identify anyone was hearsay, any error in its admission was harmless. See Tenn. R. App. P. 36(b). In our view, the testimony did more harm than good for the state. That a teller was unable to identify the defendant tended to support the defense theory.

Finally, the defendant contends that the trial court erred by permitting Deputy Everson to testify that police investigated Crime Stoppers leads implicating persons other than the defendant

-8-

and ruled them out as suspects. The first testimony regarding Crime Stoppers occurred during Deputy Everson's direct testimony:

> Q  And as a result of that did you receive any Crime Stopper tips?
> A  Yes, we did.
> Q  Did you investigate the Crime Stopper tips?
> A  Yes.
> Q  And was [the defendant] identified as an individual who committed the robbery?
> A  In one of the Crime Stopper tips, yes.

When defense counsel objected, the state responded that the testimony was being offered to show how the defendant became a suspect in the investigation, not for the truth of the matter asserted. Defense counsel requested a curative instruction and the trial court gave the following:

> Ladies and gentlemen, the testimony that you've just heard is not offered for the truthfulness, the truth of that testimony. It's only offered to establish that an identification was made, not the truthfulness of it but that an ID was made. . . .
> In other words, somebody called him and gave him information. The mere fact that it was given does not mean that it's true. . . .

During cross-examination, defense counsel elicited the following testimony from Deputy Everson:

> Q  That was one of three Crime Stoppers tips identifying possible suspects out of the newspaper?
> A  I believe I had four – four other tips other than [the defendant].
> Q  Okay. And you had people calling identifying a Ronnie Cain as the person. You had people calling identifying a man named Larry Shea as the person whose picture was in the paper.
> A  Yes, sir, uh-huh.
> Q  And if there's another name given I'm not aware. Do you remember any other name?
> A  I don't remember it was on a Crime Stopper tip, I believe I got a contact from a West Memphis officer, he called me directly.

On re-direct, the state questioned Deputy Everson regarding the outcome of the other Crime Stoppers tips:

> Q  The Crime Stoppers tips that implicated other people [–] did you investigate those Crime Stoppers tips?
> A  Yes, sir.
> Q  And did you rule those out?
> A  Yes, sir.

The trial court sustained defense counsel's objection that the deputy's statements were "conclusory . . . and involve[d] hearsay."

In our view, the statements at issue do not constitute hearsay. The deputy testified that he investigated other Crime Stoppers tips and, as a result, "rule[d] them out." He did not testify as to any out-of-court statements. Nor was his testimony necessarily grounded in hearsay. For example, the deputy might have ruled out the other Crime Stoppers tips based on physical evidence. Additionally, the trial court sustained the defendant's objection at trial. Because defense counsel failed to seek a curative instruction, the issue has been waived. See Tenn. R. App. P. 36(a); State v. Jones, 733 S.W.2d 517, 522 (Tenn. Crim. App. 1987) (holding that "failure to request [a] curative instruction[]" is failure to take action "reasonably available to prevent or nullify the harmful effect of an error").

Accordingly, the judgments of the trial court are affirmed.

 

_____
GARY R. WADE, PRESIDING JUDGE